Turn to the third case on our calendar, U.S.A. v. Charles Huckabees. Okay, Mr. Cervella. May it please the court, my name is Jonathan Cervella and I represent Charles Huckabees. I'm going to begin with the challenge to the insufficiency of the indictment. And admittedly the law in this circuit is not hospitable to an indictment challenge like the one we've made. We acknowledge that the indictment need do little more than track the language of the statute. The question is, what is a little bit more? And following along that line of reasoning, I'd like to make a few observations. First, the superseding indictment in this case is terse, even by Southern District standards. If you look through the two substantive counts... The Southern District has a reputation for terseness. I think that their indictments tend to be a little bit lighter than indictments from the Eastern District in my somewhat brief experience. But even so, this indictment is short. I mean, I think I counted approximately 50 words, including boilerplate, that weren't from the statutory text in counts one and two. And what's wrong with that? Well, that's where I'm heading right now. But before I get there, I'd like to point out that if the court finds error in this case, it will be error that the government invited. If it's indeed true that the complaint in the previous renditions of the indictment that had slightly more facts, if those were the same charges that Huggins ultimately faced, then the government could easily have added those paragraphs into the superseding indictment that Mr. Huggins was tried on. They chose not to, and I think that they should have to face the consequences of that choice. The second observation is that... Well, I'm going to skip to the third in light of the judge's question, and I'll come back to that. Why is that bad? In this case, the way the charges were in the indictment and the way the case was presented to the jury, the way the government presented its case, the defense had no choice but to convince the jurors that Mr. Huggins' operations in West Africa were real. So whether or not the government had to prove that they didn't exist or did exist, in fact, they took a sort of atheistic view towards them or perhaps a skeptical agnostic. They said, we don't know if they exist or not, but that doesn't matter. Judge Winter, in terms of the sufficiency of the evidence, absolutely none. There was evidence of misappropriation. In terms of the sufficiency of the indictment, however, it did make a difference for the reason I just stated. And for precedent, I point to the somewhat obscure case of U.S. v. Bortnowski. For sufficiency, it didn't. The difference was this. The defense effectively had a burden. The defense had to prove. And let me add, Judge, that there's no real dispute that the assets in West Africa existed. They existed. I mean, they were there. The licenses were there. Whether or not Mr. Huggins inflated the value or the cost of those assets when he was taking money from investors, and certainly he inflated the likelihood of a return, those are separate issues. But those assets existed, and yet, throughout the case and at every opportunity, the prosecution poured scorn on the idea that Mr. Huggins owned mining rights in West Africa, at every opportunity they had. So that put the defense in a position that before it could even attack or turn to or defend against what the government will call the core of its case, the misappropriation theory that Your Honor just referenced, the defense first had to prove or convince the jury that there was something in West Africa, because if there wasn't, literally every word that Charles Huggins said to his investors was an out-and-out lie, to sort of bring it full circle here. I don't quite understand. Even if the defense proved the existence of corporations authorized to do the kind of business he represented, that would not have rebutted the main charge, which was he took money, and then spent it, promising to use it in those corporations, and then spent it on himself. Your Honor, I agree 100% with that assessment. Why was the defense put under some terrible burden, some unjust burden? Because before the defense… If there was a burden, it wouldn't be a defense. The way the case was charged to the jury, they were just directed to this indictment with 50 words not in the statute. The jury could easily have convicted. They could have bypassed the bank statements and the misappropriation evidence and convicted Charles Huggins on the grounds that he had nothing in West Africa. The whole thing was just a series of chimeras. It was just a pie-in-the-sky advance fee scheme lie that he told to get people's money. They could have convicted on those grounds because the indictment was… But they argued that. The government argued that it was a misappropriation case. Your Honor, I think we make the case very strongly, especially pages 22 and 23 of our main brief and throughout the point one of our reply brief, that that's not the case. At every opportunity the government had, they literally scoffed at the idea that Huggins had anything at all in Africa. They had been in the room with the official from Sierra Leone. They did a deposition of him, his whole pedigree, and then when they got before the jury in summation, they said that that official was somebody who held himself out, who purported to be a government official. There's no dispute that he was a government official, but by pouring doubt on those things, they basically elevated the defense's burden. The defense could have been convicted on the theory that there was nothing in West Africa, even if that wasn't the heart of the government's case. That's the issue that Bortnowski deals with, and I think that it's one that on these unusual facts has once again come before the court. I've got one minute left. I'd like to briefly move on to sentencing. Two things I'd like to get in my 50 seconds here. First, I made a mistake in the reply brief. Exhibit 383 was admitted to evidence. It was at the tail end of Anne Thomas's testimony. The government sort of put it in, so that's incorrect. Everything else I say about the exhibit is correct. It was a compendium of previous ledgers that in many cases conflicted with the previous ledgers that it was supposedly based on. That then became the driving force behind Huggins's sentence, and for that reason alone, whether it's a plain error or ineffective assistance of counsel claim, the sentence needs to be vacated and we need to go back to the district court for a recalculation. Remind me if this is the case where the judge said, I give the same sentence, whether the loss calculation was right or not. It is. So there was one issue, Judge Rustani, about the calculation. It was whether or not the judge could appropriately, I see my time's up, but I'll answer your question, whether or not the judge could appropriately include $5.5 million from uncharged conduct in the fraud loss calculation. That was the only objection the defense made, the second string attorneys that came in to do the sentencing. That was the objection they made. So in imposing the sentence, Judge Stein noted that even if I'm wrong about those $5.5 million being relevant conduct, I would still consider the loss to be $8.1 million in terms of a 3553 total culpability type analysis.  And if anything, it drives home the point that Huggins' sentence was based on the loss. So that if the loss was lower than Judge Stein believed it to be because of the calculation errors that we outlined, then certainly Judge Stein would have come down in his sentence. Thank you. May it please the court. Edward Imperatore for the United States. I've represented the government at trial below in the district court and in this court on appeal. This court should affirm the judgment of the district court in all respects. Can I ask a couple of questions about the sentencing? Yes, go ahead. There was an enhancement applied for receiving money from a financial institution as a result of the offense. Isn't that right? That's correct, Judge Winter. How was the financial institution's payment of this money to the depositor a result of the offense? Yes, Your Honor. Let me just note as a threshold matter, before I get to Your Honor's question, that it's a plain error standard here because the defendant never made this argument below to Judge Stein. And secondly, the court doesn't need to consider this particular issue because Judge Stein made clear twice on the record. I thought I read that all these things were listed in the PSR and were all objected to. The objection was a summary objection, Judge Rothstein. So that doesn't count? That doesn't count. The defendant has to object on the particular ground that he's raising in this court. All he said in his objection was… What's the authority for him? Your Honor, I don't have the case in mind, but I believe this court has said previously that the defendant needs to raise the particular objection below as he's raising in this court. And as the court can see, this argument was never presented to Judge Stein. Judge Stein looked at the plain meaning of the statute, and he said this is an easy question. It certainly applies. Why don't you answer, Judge Winter? Yeah. So I think the question that Your Honor is asking is what is the meaning of derived from? Is this money that's derived from a financial institution? Under the plaintiff… Really, as a result of the offense. That's the language I'm looking at. As a result… Because the bank received this money from Huggins, and had Huggins proved the use of mining in West Africa, the bank would have had to pay out the same amount of money. So whether or not the fraud occurred, what happened to the bank, which was simply to pay the deposit, what happened to the bank had nothing to do with the offense. It had a lot to do with the offense in that this was money that came in from victims. It was deposited into bank accounts that resided at Bank of America in the name of the companies. And the money was simply withdrawn by Huggins and his co-conspirators. And under the plain languages… The bank. I'm sorry, Judge Winter. I didn't understand your question. The bank. Well, it's under this… The banking system in this country involves fractional reserve banking. Under the FDIC regulations that interpret the Federal Reserve Bank, only 3% of deposits are kept on hand by a bank. Banks limit the number of withdrawals that a customer can make in one month. So when the money comes into the bank's coffers, the bank has the ability to distribute it, to alienate it, to transfer it to others, to loan it, and invest it. And so what that means is that this type of conduct, this rapid withdrawal of significant sums of money, certainly has an effect on the bank. And it's money that is resulting from the offense. This is money that has come into the bank as a result of Huggins' misrepresentations to victims. There have been no misrepresentations. I'm sorry, Judge Winter. Suppose he had used the money from mining in West Africa. The bank would have paid the money out the same way it paid it out for him to go to fancy restaurants or whatever he did. Every crime that involves a payment by check is going to turn into having an enhancement for getting money from a financial institution. Clearly, the enhancement means you got the financial institution's money and it lost it. That's not what happened, did it? The difference in this case, Your Honor, is that the second part of this enhancement turns on the defendant's receipt of the money. If he had wired the money to Africa to use in mining, of course it wouldn't apply because the defendant wouldn't have derived, personally received, over a million dollars in cash from the bank. Whether the bank pays the corporation in Africa or pays him doesn't matter to the bank. That may be true, but that's not what this offense turns on. It turns on whether the money is derived from the bank. As the Ninth Circuit interpreted in the United States v. Van Alstyne, that means simply flowing from the bank. Secondly, that the defendant himself received the money, received over a million dollars. That's what separates this from a situation in which the money would be used to mine. If the money were actually used to mine, that would potentially be consistent with Huggins' representations to victims. That potentially could have been a defense. Of course, that's not what he did. I won't continue. I find your arguments really unpersuasive. I'll go ahead and play that. The way I was looking at this is you enhance things for some reason. And so if he steals the money from these people and puts it in his bed and never puts it in the bank, it's kind of the same as if he put it in an account and got it out of the bank. I don't see what the purpose of the enhancement is if it's just referring to withdrawals from an account. Under the plain meaning of the statute, Judge Rostani, it's money that is derived from the financial institution. And I would also note to the— This is applied to mortgages and loans and stuff like that. The plain language of the enhancement doesn't suggest that. And I think it's also important to take into account that this is part of a two-step level of enhancements. Right. The second one is if you can prove that it affected the bank. Yes. So there's no requirement that this affect the safety or solvency of a bank.  You can cheat on your loan from the bank, and it's not— and nobody's going to be able to overprove that that affects the bank's financial standing. But even if this court were to adopt Stinson's reasoning, we've met it here because the bank is exercising dominion and control over the money that comes in. But I would also just note the court doesn't need to reach this issue because Judge Stein made very clear at pages 232 and 242 to 243 of the record that he was imposing a sentence that was based on his application of the 3553A factors. He said explicitly twice, this guideline range way overstates the seriousness of the offense. This is not a case where the sentence he imposed bore any relationship or was tied in any way to the guideline range, which was 262 to 327 months. He imposed a sentence that was more than 50 percent below the guideline. I'm just wondering how much we can do that. It seems to me if the judge says, look, I know what the guideline is on this particular guideline. I might be wrong. I might be right. It would be the same. But can we do that when his statement doesn't relate directly to this particular guideline? He made that statement. He made a statement like that in connection with laws, right? But he didn't make a specific statement about this guideline. Well, he made a specific statement insofar as he said that the guideline range way overstates the seriousness of the offense. And I think that's important here because the judge is looking at a guideline range that is more than 50 percent above the sentence he actually imposed. And he made very clear in his reasoning why he was imposing this sentence. He said it was based on his interpretation of the history and characteristics of the defendant, including the defendant's age. It was based on the victimization that took place here and the offense itself. So it's clear on this particular record that the sentence he imposed would be the same, regardless of whether this enhancement applied. And I think Judge Stein's statement about the loss amount was instructive because there was no dispute that the loss would be $2.3 million if it included the Jay York and Yorogo conduct. And what Judge Stein said when he said, regardless of what the loss amount is, my sentence would be the same, is he was saying, essentially, even if the loss amount is four levels higher, even if it's $8.1 million, my sentence would be the same. So he's saying, in essence, even a four-point swing in the guideline range would have no effect on my sentence. And that's exactly the sentence he imposed. Judge Stein did what one would hope a district judge would do, which is to make an individualized assessment of the defendant and to impose an absolute sentence that is not pegged or tied to the guidelines. I have the same question about the private trust enhancement. In a fraud case, you have to show that the victim relied upon the defendant's statements. You seem to treat the abuse of trust contrary to our cases. We have cases saying that it has to be a quasi or full fiduciary position, and he was not in that. But you seem to be saying that anytime someone trusts a fraud perpetrator, which is every time because they have to rely, that they're subject to this enhancement. No, Judge Winter. I think that what we're arguing here is, first of all, as we stated in our supplemental letter, this Court's opinion in Riverneiter forecloses the argument to that effect that the defendant's making here. There are a number of factors. The defendant in Riverneiter was very similarly situated to Huggins in that, number one, he functioned as something of an investment advisor for his victims. And there were two particular victims here that I would draw the Court's attention to, Annette McCain and Mimi So. These were people who weren't simply solicited by the defendant. They had trusted relationships with him, and he used those relationships in order to solicit them. But it's more than that. There are a number of factors here that the Riverneiter Court spells out. The second factor is that he— But I didn't receive your 28-J letter, so you should be filling me in. I apologize. And just to summarize it is that this Court recently— When was that sent in? It was submitted to the Court— July 7th. July 7th via PCF and by hand as well. And I would be happy to hand up a copy if that would be helpful. Great. Thank you. But what— Why don't you pass it up? Only the out-of-towner got it. I don't know if it's going to involve wrecking your files there. If I could just summarize it for Judge Winter. This Court on July 7th issued an opinion in the case United States v. Riverneiter, and the case addressed the application of this breach of trust enhancement in a situation that is very analogous to Huggins' conduct there. An individual perpetrated an investment of fraud scheme in which he solicited investors, and he made arguments that are very similar to the ones that Huggins is making here. Specifically, he's claiming, number one, he lacked discretionary authority, and number two, he's arguing, essentially, I didn't have that sort of trusted relationship with my victims. And there are three factors that the courts— that this Court pointed to in Riverneiter that are present here. First, he functioned as something of an investment advisor for victims, and as I just mentioned, Huggins certainly did that for at least two victims in this case. Second, he was not subject to any oversight or supervision within his organization, and that's unquestionably true for Huggins here. He was the organizer, and nobody knew what he was doing with the money outside of his specific co-conspirators. And the third factor that the Riverneiter Court addressed is the fact that this particular defendant in that case had considerable discretion. And unquestionably, Huggins had enormous—in fact, total discretion in terms of the representations he was making to his victims, the way in which he solicited them, and the use of the money. And as this Court has said previously in cases like United States v. Stitsky and United States v. Viola, Huggins possessed enough discretion to perpetrate a difficult to detect fraud, and that's exactly what happened in this case. So certainly—and it's important to bear in mind, too, that the application of this enhancement turned on Judge Stein's factual findings on this front, and it certainly cannot be said that he clearly erred in reaching those findings. So unless the Court has any further questions— Does it matter that these folks were shareholders in these corporations? Judge Restani, they actually were not shareholders. There was no—this was an investment scheme in which the defendant simply— he incorporated companies. They were shell companies. The trial proof, which came in through the cooperating witness, Ann Thomas, and others, was that the company had no real existence. It had an existence on paper. It had a bank account. And so what Huggins did was he gave documents that stated they were investment contracts that said essentially, if you invest your money with me, it will be used for mining. They weren't given any shares in the company. It was essentially a privately held company. So that also goes to this issue because here Huggins is essentially— has total discretion within this privately held company in order to provide these investments to people, and I think that enhances the conclusion that the breach of trust assessment applies on these facts. So unless the Court has any further questions, the government will rest on its submission. The judgment of the district court should be affirmed. Mr. Suvella? Thank you. I think that—I'd just like to make a few points bullet style if I can. First of all, this is a fraud case. So however persuasive the government is about it, the idea that Judge Stein's sentence wasn't affected by the number amount of the loss strikes me as extremely unlikely. I mean, the essence of the crime is how much money you manage to get from other people. So in fraud, that number is extremely important. What was the range, the presumptive range, if we can call it that, with which Judge Stein was working? The probation department recommended 240. I think that the range was— He came down fully 50 percent. That's right, and that's where I was going next. If you look at page 233 of the appendix, Judge Stein says, and that's about half of the guidelines range, right? So we're back to where I started. I mean, Judge Stein looked at the guidelines range. This is, of course, 2014, before the fraud loss guidelines were revised. So there's a lot of clamor about how they overstate the seriousness of the crime. He looked at them. He cut them in half. There's no reason to believe that he wouldn't do the same thing if we went back to resentence and the presumptive guidelines range was half of what it is now, that he wouldn't give about half of that new guidelines range. In terms of preservation, if the court will look at ECF document, I believe it is 316. That is the sentencing submission. It is pro forma, which ties into our in effect. What's the number? It's 316. It was on March 25th. On the third page, the objection to the financial institution enhancement is there. One of our core points on appeal is that sentencing counsel did not do a good job. It's not a well thought out objection. It doesn't cite Stinson. But in this case where the government is making a totally novel argument for application of that enhancement, I think it was hardly incumbent on defense counsel to anticipate. In effect, the assistance counsel claimed to go to the loss business. Excuse me? It does, Your Honor. But we're pointing out that these were attorneys that came in a week before trial. They stood in on sentencing because the main attorney had become ill. I'm just pointing out that, yes, it wasn't just on the loss that they dropped the ball. They didn't do a good job of representing their client during the sentencing stage. But I don't think you need to get to that for the financial fraud enhancement, Your Honor. I think that plain error or just normal error either, whether it's preserved or not, is enough to kick out that enhancement because it is, again, totally novel. It's both error and plain error. I think it is. I mean, when we put in our initial briefs, Your Honor, Molina Martinez hadn't come down yet. But the fact of the matter is that the Supreme Court is going in the opposite direction than the government is trying to push this panel. I mean, clearly the Supreme Court is seeing guidelines, errors in sentencing, whether preserved or not, to be significant. And they're driving that point home nearly every year now. Did we get a 28-J letter on Molina Martinez? No, but I did cite it in my reply. Unless there's anything further? Thank you very much. Thank you. Thank you. We'll reserve this one.